**SARASOTA–CHARLOTTE BROADCASTING CORP., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

No. 91–1186.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 1, 1992.

Decided Oct. 27, 1992.

Vincent A. Pepper, with whom Peter Gutmann and Louis C. Stephens, Washington, D.C., were on the brief, for appellant.

Gregory M. Christopher, with whom Robert L. Pettit, Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, Washington, D.C., were on the brief, for appellee.

Before: MIKVA, Chief Judge; RUTH BADER GINSBURG and RANDOLPH, Circuit Judges.

Opinion for the Court filed by RUTH BADER GINSBURG, Circuit Judge.

RUTH BADER GINSBURG, Circuit Judge:

This is an appeal from a Federal Communications Commission (Commission or FCC) order denying the application of Sarasota–Charlotte Broadcasting Corporation (SCBC) to operate a new FM radio station in Englewood, Florida, and granting the mutually exclusive application of Sandpiper Broadcasting, Inc. The decision turned on a comparison of the applicants' proposed integration of ownership and management, a critical factor in the Commission's comparative licensing scheme. *See Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393, 395 (1965).[1] The Commission gave SCBC no integration credit because the Equal Employment Opportunity (EEO) statement filed as part of SCBC's application identified a non-owner as general manager. In a timely-filed integration statement, however, SCBC identified its owner as overall manager of the new station; the Commission rejected this integration submission as an impermissible variance from SCBC's application and an improper upgrading of its comparative showing. We conclude that the Commission's peremptory rejection of SCBC's integration proposal was arbitrary and capricious. Accordingly, we reverse the Commission order and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

On September 8, 1987, SCBC's 90.2% owner E.J. "Ted" Ewing applied for a permit to construct and operate a new FM station in Englewood, Florida. At the time, Ewing was the President and top manager of Englewood's only existing radio station, WENG(AM). Although Ewing was responsible for the overall management of WENG, his managerial assistant, Kent Higgins, bore the titles General Manager and Vice President.[2] In accordance with FCC procedures, SCBC planned gradually to divest itself of the AM station if it gained the permit to operate the more de-

---

1. "By integration, the FCC means the full-time participation by owners of a radio station in its management. For purposes of calculating the degree of credit an applicant gets for integration, the FCC measures the percentage of total ownership in the hands of full-time managers." *Bechtel v. FCC*, 957 F.2d 873, 875 (D.C.Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 57, 121 L.Ed.2d 26 (1992).

2. Because the FCC peremptorily rejected SCBC's integration submission without a factual inqui-

ry, we accept, for purposes of this review, SCBC's allegations concerning its allocation of management responsibility. SCBC explained, in its presentation to this court, that "Mr. Ewing found it desirable to reward his managerial assistant (whose salary was restricted by the limited revenue-producing capacity of the daytime-only station) with the incentive-building title of general manager." Appellant's Final Brief at 4.

sirable FM station.[3]

Twelve other applicants, including Sandpiper Broadcasting, Inc., filed competing applications for the permit. The application form used by the FCC at that time did not ask an applicant to set forth its integration proposal.[4] If the applicant in fact made representations regarding integration in its application, however, it could alter those representations only by revision made prior to the deadline for application amendments (the "B cut-off date"). *See, e.g., In re Midwest Broadcasting Co.*, 70 F.C.C.2d 1489, 1494 (Rev.Bd.1979). Generally, under this regime, applicants waited until the exchange of exhibits, which occurred in this case after the B cut-off date, to reveal their integration proposals.

The application did call for a statement of the applicant's EEO program, including the name and title of the person responsible for the program's implementation and administration. SCBC, as part of its application, duly submitted its EEO statement, using WENG stationery to set out its proposal. Captioned "EQUAL EMPLOYMENT OPPORTUNITY PROGRAM," the submission stated in part that "Kent Higgins, Vice President and General Manager, will be responsible for the implementation and administration of our Equal Employment Opportunity Program." Later, when Higgins left SCBC's employ and was replaced by Lowell Thomas, SCBC amended the EEO statement to name "Lowell Thomas, General Manager" as the person who would be responsible for the EEO program at the proposed station.

On January 4, 1989 (after the B cut-off date), SCBC submitted its integration and diversification statement certifying that Ewing would be integrated full-time into the operation and management of the proposed station and that he would "serve as general manager managing and supervising the overall operation of the station." On March 15, 1989, SCBC filed in support of its integration proposal a number of exhibits detailing Ewing's longstanding community involvement and broadcast experience. The Administrative Law Judge (ALJ), however, rejected virtually all evidence regarding SCBC's integration proposal as an untimely variance from SCBC's application (specifically, the EEO statement); that initial submission and the amendment to it, the ALJ observed, had identified Higgins and then Thomas, but never Ewing, as general manager of the proposed station. What was a fatal variance, the ALJ ruled, also constituted, for the very same reason, an improper upgrading of SCBC's comparative showing. SCBC therefore received no integration credit, effectively ending its chance of obtaining the permit for the new station. The ALJ granted the application of Sandpiper Broadcasting, Inc., and SCBC appealed that decision to the Review Board.

The Board, and subsequently the Commission, affirmed the ALJ's decision. *Sarasota–Charlotte Broadcasting Corp.*, 5 F.C.C.R. 3837 (Rev.Bd.1990), *aff'd in relevant part*, 6 F.C.C.R. 1665 (1991). The Commission concluded that because SCBC had stated in its EEO statement who would be general manager of the proposed station, SCBC had "voluntarily submitted part of its integration proposal"; it followed, according to the FCC, that SCBC's attempt to substitute Ewing as general manager after the B cut-off date involved an impermissible variance and an improper upgrading of its comparative showing. 6 F.C.C.R. at 1665 ¶ 5.

---

3. The FCC gives the operator of a daytime-only AM station who seeks FM facilities in the same community additional comparative credit if the operator pledges to divest itself of the AM station within three years if awarded the FM station. *See* In re Implementation of BC Docket No. 80–90 to Increase the Availability of FM Broadcast Assignments, 101 F.C.C.2d 638, 646–47 (1985), *aff'd sub nom. National Black Media Coalition v. FCC*, 822 F.2d 277 (2d Cir.1987).

4. The application was revised in 1989 to require applicants to indicate their integration plans up front. *See* In re Revision of Application for Construction Permit for Commercial Broadcast Station (FCC Form 301), 4 F.C.C.R. 3853, 3865 (1989) (asking applicants to "[l]ist each principal ... who ... proposes to participate in the management of the proposed facility ..., state whether he or she will work full-time ... or part-time ... and briefly describe the proposed position and duties").

ANALYSIS

We review decisions of the FCC under the familiar "arbitrary and capricious" standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1988). The agency's conduct here, we are satisfied, does not meet that tolerant standard. We see no tenable basis for the Commission's assertion that SCBC "voluntarily submitted [together with its application] part of its integration proposal," making it proper for the ALJ to refuse to consider evidence of Ewing's integration into the management of the proposed station. 6 F.C.C.R. at 1665 ¶ 5. Accordingly, we reverse the Commission's order and hold that the Commission was obliged to accept and fully consider evidence relating to Ewing's integration.

We discern two plausible readings of SCBC's EEO submission and its amendment, neither of which supports the Commission's conclusion that SCBC voluntarily submitted an integration proposal. One reading is that the term "General Manager" in the EEO statement referred to Higgins' (and later Thomas') position at the *existing* AM station, not the proposed FM station. Under this reading, the proposal stated, in effect, that "Kent Higgins, Vice President and General Manager *of WENG(AM),*" and subsequently "Lowell Thomas, General Manager *of WENG(AM),*" would be responsible for the EEO program at the new station. We find this a logical reading of the proposal. It is corroborated by the placement of the initial statement on WENG stationery, and is consistent with SCBC's intention to have one and the same EEO program for both WENG(AM) and the proposed FM station during the temporary period SCBC would operate both stations.[5] If we interpret SCBC's initial EEO statement in this manner, there is no "variance" between that statement, included with SCBC's application, and the timely-filed integration proposal identifying Ewing as the General Manager of the new station.

A second tenable reading of the EEO statement is that it did indeed identify Higgins, and then Thomas, as the person who would be the General Manager of the new station. This was the Commission's interpretation. See 6 F.C.C.R. at 1665 ¶ 3 (observing that SCBC's EEO program "stated that Kent Higgens [sic] would be general manager of its proposed station"). Even if we were to accept the Commission's reading, however, we would not arrive at the conclusion that the EEO statement "set[ ] forth an integration proposal." *Id.* ¶ 4. In our judgment, the FCC made an irrational attribution. SCBC's identification of Higgins and then Thomas as "General Manager" of the proposed station was not inconsistent with its identification of Ewing as the "general manager managing and supervising the overall operation of the [proposed] station." As the Commission's counsel recognized at oral argument, what counts for purposes of determining an applicant's integration credit is not who will bear the title "General Manager," but who will actually manage and supervise the overall operation of the station.[6] The person who performs the function of top supervisor is the "general manager" for integration purposes, even if he is called by some other name (*e.g.,* President) for other purposes. Here, SCBC avers, that person was and had always been Ewing, though he chose to confer on his managerial assistant the incentive-boosting title "General Manager."

In sum, we find it beyond reasonable doubt that the EEO statement SCBC included with its application did not deal with integration. The submission was simply and solely a statement of the proposed station's EEO program, and it contained nothing that fairly could be read as part of an integration proposal. We do not ques-

---

5. *See supra* note 3.

6. The Commission's counsel forthrightly acknowledged at oral argument that the title "General Manager" is not self-defining, nor is it defined in FCC regulations. Thus, nothing prohibits a radio station from having an overall manager with the title "President" and a managerial assistant with the title "General Manager." Nor would it be forbidden, for example, to have two "General Managers," one responsible for the station's overall supervision and the second responsible for matters such as the station's EEO program.

tion the legitimacy of the FCC's policy of strictly disallowing post cut-off date changes in an applicant's comparative showing, but the Commission may not arbitrarily call a submission a "variance" when it is not.

CONCLUSION

SCBC did not voluntarily set forth any part of its integration proposal when it submitted, as part of its application, its EEO statement. It was therefore arbitrary for the Commission to discredit SCBC's integration submission on the ground that it varied fatally from SCBC's application. Accordingly, we reverse the Commission's order and remand the case for proceedings consistent with this opinion.

*It is so ordered.*